No. 25,725.

STATE BANK OF WEBBER, MONTROSE STATE BANK, DR. E. L. RAY-
NOLDS, S. W. KORB, A. B. TEGLEY and THE McCARTHY HARDWARE
COMPANY et al., *Appellees*, v. FRED H. DIAMOND et al., *Appellants*.

SYLLABUS BY THE COURT.

1. HOMESTEADS—*Nature and Duration—Evidence.* In an action by creditors to
subject land to the payment of debts of the deceased owner, the evidence
considered and held sufficient to support a finding that the land was not a
homestead.

2. MORTGAGES—*Foreclosure—Rights of Prior Mortgagee.* In the proceeding
above described a mortgagee (one of the creditors) who had a first lien on
the land was entitled to foreclosure and sale of the land to satisfy his lien.

3. SAME—*Redemption—Right of Heirs of Deceased Mortgagor.* Where, after
the death of the mortgagor (and owner of the land), a real-estate mortgage
is foreclosed and the property sold by the sheriff, the heirs of the mortgagor
are ordinarily entitled to the statutory period of redemption.

4. EXECUTORS AND ADMINISTRATORS—*Action by Creditors—Allowance of Attor-
ney's Fees.* An allowance of attorneys' fees as costs in an action in the dis-
trict court by creditors to subject the land of the deceased to the payment
of her debts was without authorization.

Appeal from Jewell district court; WILLIAM R. MITCHELL, judge. Opinion
filed October 10, 1925. Affirmed as modified.

*R. W. Turner, D. F. Stanley* and *R. B. Turner,* all of Mankato, for the
appellants.

*R. C. Postlethwaite, D. M. McCarthy* and *L. E. Weltmer,* all of Mankato,
for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The plaintiffs filed a creditors' bill to subject cer-
tain land to the payment of debts of Emily Diamond, deceased.
The defense was that the land was a homestead. The plaintiffs pre-
vailed, and defendants Fred H. and Anna Diamond appeal.

The facts as told by the court's findings are substantially as fol-
lows:

H. P. Diamond and his wife, Emily Diamond, Jewell county pio-
neers, homesteaded the northeast quarter of section 24, township 2,
range 8, on which they lived during their married life until they
moved to Mankato, in 1906. They were frugal, hard-working and

1. Homesteads, 29 C. J. §§ 25, 343, 344.   3. Mortgages, 27 Cyc. 1804, 1808.
4. Costs, 15 C. J. §§ 248, 249.

honest, and accumulated at one time about nine hundred or a thousand acres of land, mostly contiguous to the original homestead. They bought a residence property in Mankato in 1906, taking the title in the wife. They remodeled and fixed over the house, built hog sheds and barn, and made themselves a comfortable home and lived there for nearly two years. It was their intention to make this their permanent home. Sometime during the second year of their residence in Mankato Diamond fell and broke his hip. From this injury he never recovered so that he could walk without a crutch and a cane or two crutches. He was confined in the hospital for several weeks. After his return from the hospital he was taken to the home of his son, Fred Diamond, where he and his wife lived several months and occupied the bed and room they had occupied during their former residence on the old homestead. They lived as one family with the family of the son, Fred Diamond, all eating from a common table and without charges for board on the part of any of them. Not long after his injury the home in Mankato was sold and their furniture taken to the home of Fred Diamond and the bedding stored in the house. The other goods were stored in the barn on the premises. A house of four or five rooms was constructed on what is known as the Kuhlman place, a half section lying just east of the Diamond homestead, and H. P. Diamond and his wife moved into this house, taking their household goods, sometime the next spring, and made this their home for between one and two years, during which time he hired a hand and handled some live stock on the place. His health at this time was very poor and he was advised by his family physician that on account of the heart trouble, with which he was afflicted, unless he moved nearer to a physician, sometime a doctor would get to him too late, and he and his wife decided to move back to Mankato. Fred Diamond wanted to use the house on the Kuhlman place as a residence for his hired man with a family, and H. P. Diamond and wife again moved into the home of Fred Diamond, again storing their household goods, after crating them, in the barn, and moving the bedding into the house, H. P. Diamond and wife intending at the time they moved from the Kuhlman place to move to Mankato as soon as they could make proper arrangements for a place to live. Early the next year, in February, a house and lot were bought in Mankato, the title being taken in Emily Diamond, and this house was remodeled and built onto and a barn

was built and a comfortable home was thus provided, into which they moved as soon as it was ready for their occupancy. Here they lived until November, 1912, at which time occurred the death of H. P. Diamond. Emily Diamond remained in this home only a short time thereafter and then went to make her home with her son, Fred Diamond, where she lived until her death in April, 1921. This Mankato property was the homestead of H. P. Diamond and Emily Diamond at the time of his death. It was afterwards sold by Emily Diamond, and she did not afterwards purchase a home for herself, neither did she marry thereafter, and the court finds that she became a member of the Fred Diamond family. The court further finds that the land in question in this suit was not the homestead of H. P. Diamond and Emily Diamond at the time of the death of H. P. Diamond; and that Emily Diamond, subsequent to the death of her husband, H. P. Diamond, did not establish a homestead right in said land. That no contract existed between H. P. Diamond during his lifetime and Fred Diamond by the terms of which H. P. Diamond was to convey to Fred H. Diamond the lands above described. That H. P. Diamond left a will, in which, after giving small bequests to his children, he gave the land in question and other property to Emily Diamond. This will was probated and Emily Diamond acted as executrix thereof, and Fred Diamond was well aware of the situation and assisted his mother in making her reports and filed a receipt in the probate court acknowledging that he had received $100. Emily Diamond left a will directing payment of her debts, devising $100 to her son, George H. Diamond, $50 to her granddaughter, Lucy A. Elder, and to her son, Fred Diamond, the balance of her estate, and appointing Fred Diamond as executor. Fred Diamond qualified and is at this time such executor.

At the time of the death of Emily Diamond she left no personal property and had practically none at the time she executed her last will, and the real estate described in the petition was listed by said executor in his inventory as the property of the estate of Emily Diamond. There were allowed in the probate court certain claims which were enumerated. The court finds The State Exchange Bank of Mankato is the owner and holder of a mortgage on the premises in question in the sum of $2,000, which is a first lien upon said premises. The mortgage in the sum of $2,300 executed by Fred H. Diamond and Anna Diamond to the Farmers National Bank of

Mankato, Kan., and the mortgage in the sum of $2,000 executed by
Fred H. Diamond and his wife to R. W. Turner, drawing interest
at the rate of —— per cent per annum, now held by The State Ex-
change Bank of Mankato, Kan., are found not to be liens upon the
land in question in this suit and described in said mortgages, except
as to the interest of F. H. Diamond. That on February 28, 1921,
Fred H. Diamond, Emily Diamond and Anna Diamond, for bor-
rowed money, executed and delivered to the Farmers National
Bank of Mankato their note for $2,450, with interest, etc., and that
payments were made and other moneys advanced by the payee in
said note for use in paying interest and taxes on said land owned
by the estate of Emily Diamond, deceased, which were used by said
estate for such purpose, and payments made on said indebtedness
amount to $2,343.51, with interest at ten per cent, for which amount
the Farmers National Bank of Mankato, Kan., is entitled to judg-
ment against F. H. Diamond, Anna Diamond and Fred H. Diamond,
executor of the estate of Emily Diamond, deceased; that at the time
of the death of Emily Diamond she owned no personal property,
and owed indebtedness of several thousand dollars, and this situa-
tion was practically the same at the time she executed the will in
question.

The court concluded that the creditors were entitled to have the
land subjected to the payment of their claims. Judgment was ren-
dered on the claims as classified and allowed by the probate court.
The State Exchange Bank, by reason of its mortgage, was found
to have a first lien on the land. The judgment of the district court
was ordered filed in the probate court and that court directed to
proceed with the settlement.

The defendants contend, chiefly, that the court erred in conclud-
ing that the land was not exempt as a homestead from the claims
of the creditors of Emily Diamond; that the court erred in not al-
lowing the statutory period of redemption on foreclosure of the
mortgage of the State Exchange Bank, and in allowing attorneys'
fees and taxing them as costs.

The plaintiffs argue that the trial court's findings are supported
by substantial evidence; that the land in question was not, at the
time of the death of H. P. Diamond, and the death of his widow
Emily Diamond, the homestead of either, and did not become the
homestead of the appellant, but that, regardless of whether it was

the homestead or not, the title, having passed to Emily Diamond, the terms of her will made the payment of legacies and indebtedness a charge upon all the real estate owned by her. They direct attention to inconsistent claims advanced by the defendants.

Fred Diamond and his wife, in a separate answer, alleged that at the time of their marriage in 1906, and the establishment of their home on the land in question, the father gave them the land on condition that they care for him and his wife Emily during their lifetime. Later they amended their pleadings, setting up a claim for compensation for services performed. The evidence showed that the father in his will devised the land to his wife Emily and made a bequest of $100 to Fred, which was acknowledged. On her part, the mother Emily devised the land in question to Fred after the payment of her debts. It would serve no useful purpose to detail the evidence. Considering all the circumstances, we are unable to say that the court erred in concluding that the land in question was not the homestead and as such exempt from the debts of Emily Diamond.

The court found that The State Exchange Bank was entitled to judgment on its note for $2,915.20; that its mortgage be foreclosed and the lands ordered sold to satisfy the judgment, but it ordered that a certified copy of the journal entry of judgment be transmitted to the probate court and that that court proceed with the settlement of the estate.

We are of the opinion that since the State Exchange Bank had a prior lien on the land by virtue of its mortgage, it was entitled to have the land sold in accordance with the decree of foreclosure. This should have been done under authority of the district court. It was proper for the other claims to be administered and settled by the probate court as was directed.

We are of the opinion, also, that the appellants are entitled to the statutory period of redemption. In the recent case of *In re Estate of Wood,* 118 Kan. 548, 555, 235 Pac. 864, it was said:

"The fact that claims for funeral expenses and costs of administration may in some cases go unpaid while the heirs of the decedent enjoy the rents and profits of land which he had owned and which since his death has been sold under a mortgage foreclosure is not a conclusive reason for holding the right of redemption to be subject to their payment. The policy of the law which creates the right of redemption has in other situations the effect of preventing the payment of just debts to the advantage of the debtor. A strong argu-

State Bank v. Diamond.

ment in favor of holding the right of redemption subject to sale to pay the decedent's debts on order of the probate court is that if no foreclosure had been had the probate court could have directed the sale of the land subject to the mortgage lien, and it seems incongruous that the right of the creditors to look for payment to the value of the land in excess of the mortgage should depend upon the course chosen by the mortgagee. We regard it as a sufficient answer to this contention to say that in this respect the creditors are in much the same situation in which they would be placed by the sale of the land on foreclosure during the life of the mortgagor. In that case they could not interfere with the mortgagor's possession for eighteen months, nor with his right to redeem. If no redemption were made the possibility of their appropriating the land to the payment of their claims would be gone forever. If the mortgagor should redeem they seemingly might then (unless they had become lien holders, having a deferred right to redeem) enforce payment by execution. (R. S. 60-3460.) With the death of the mortgagor in the present case his heir became the owner of the land subject to the mortgage and subject also to the right of the creditors to look to it for the payment of their claims. If the creditors had been actual lien holders they could not, merely by virtue of their lien, have subjected to sale the owner's right of occupancy and redemption. Their sole remedy in that aspect would be to redeem if the owner did not. We see no such consequent disparity of relief, nor any such inequity, as to forbid the liberal interpretation of the law which has been suggested, and we hold that the probate court had no power to order the sale of the appellant's right of redemption or his right to occupy the land during the redemption period." (p. 550.)

The court made an allowance for attorneys' fees. We are of opinion that there was no authority for the taxing of attorneys' fees as costs in the case in the district court.

The judgment will be modified in accordance with the views herein expressed, and as so modified will be affirmed.